ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| MARICELI RODRÍGUEZ SOLER<br><br>APELANTE<br><br>V.<br><br>EAGLE INDUSTRIES DEL CARIBE, INC.<br><br>APELADOS | KLAN202301166 | *APELACIÓN* procedente del Tribunal de Primera Instancia Sala de Lares<br><br>Caso Núm. UT2020CV00200<br><br>Sobre:<br><br>Despido Injustificado (Ley Núm. 80 de 30 de mayo de 1976); Despido por Razón de Discrimen (Ley Núm. 100 de 30 de junio de 1959) |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de febrero de 2024.

Comparece ante nos la señora Mariceli Rodríguez Soler (en adelante, la señora Rodríguez Soler o la apelante) mediante un recurso intitulado *Apelación*. En dicho escrito, solicita la revocación de una *Sentencia* emitida el 28 de noviembre de 2023 y notificada el 29 de noviembre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Lares (en adelante, TPI). En la referida determinación, el foro primario declaró *Ha Lugar* una *Moción de Sentencia Sumaria Solicitando la Desestimación del Pleito en su Totalidad* presentada por Eagle Industries del Caribe, Inc. (en adelante, Eagle).

Por los fundamentos expuestos a continuación, *confirmamos* el dictamen apelado.

**II.**

El 26 de agosto de 2020, la señora Rodríguez Soler presentó una *Querella* al amparo de la Ley de Procedimiento Sumario de Reclamaciones Laborales, Ley Núm. 2 de 17 octubre de 1964, 32 LPRA sec. 3118, según

enmendada.[1] En esencia, alegó que desde el 2006 ejercía funciones como costurera en Eagle Industries del Caribe, Inc. No obstante, expuso que el 16 de julio de 2020, el patrono querellado determinó su despido sin que mediara justa causa como prescribe la Ley sobre Despidos Injustificados, Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185a, según enmendada. Adujo, a su vez, que luego de su destitución, el patrono apelado contrató a un empleado cuya edad es menor a la suya en contravención a la Ley Contra el Discrimen en el Empleo, Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146, según enmendada. Por lo anterior, solicitó la compensación en concepto de daños por angustias mentales, salario dejado de percibir y honorarios de abogados

El 11 de septiembre de 2020, Eagle sometió su *Contestación a la Querella*.[2] Alegó que mediaron las circunstancias justificadas para decretar el despido. Indicó que la apelante incurrió en graves violaciones a las normas y los procedimientos de la industria. En particular, detalló que el sistema de vigilancia de la empresa capturó el momento en el cual ésta tomó sin autorización propiedad de Eagle, y procedió a esconderla en su cartera. Finalmente, arguyó que, durante la etapa investigativa, la apelante admitió los hechos y entregó la propiedad a la gerente de operaciones. En vista de lo anterior, argumentó que no tiene derecho a los remedios solicitados en su querella.

Luego de una serie de trámites procesales, el 10 de diciembre de 2020, Eagle presentó una *Moción de Sentencia Sumaria Solicitando la Desestimación del Pleito en su Totalidad* acompañada de una *Declaración Jurada* y documentación evidenciaria.[3] Reiteró que la empleada apelante incurrió en violaciones a las políticas reglamentarias de la empresa. Destacó que ésta tomó sin autorización unos materiales pertenecientes a la corporación para confeccionar un bulto. Alegó, además, que previo al

---

[1] Apéndice de Apelante, págs. 1-3. El 13 de octubre de 2020, el foro primario celebró una vista a través del sistema de videoconferencia. En dicho proceso, dispuso mediante *Orden* la tramitación del caso mediante la vía ordinaria. Véase, también, entrada número diez (10) del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[2] Apéndice de Apelante, págs. 4-11.
[3] Apéndice de Apelante, págs. 12-14.

despido, estuvo sujeta a varias acciones disciplinarias. Entre otros extremos, expuso que anteriormente le comunicó sobre unos señalamientos relacionados con (1) la calidad de las piezas confeccionadas y (2) el nivel excesivo de conversación y distracción a sus compañeros. Planteó que no existen hechos materiales en controversia que ameriten la celebración de un juicio. En consecuencia, solicitó la desestimación de la reclamación a través de la vía sumaria.

En respuesta, el 1 de junio de 2023, la apelante presentó una *Moción en Oposición a Sentencia Sumaria.*[4] Señaló que existe una controversia en torno a los elementos subjetivos de intención. En específico, aseveró que era una práctica permitida por los supervisores la utilización de la tela decomisable para la elaboración de bultos personales. Añadió que las amonestaciones aludidas por la parte apelada no guardaban relación con la razón del despido y ocurrieron dos años anteriores de la fecha de los hechos. Además, requirió la celebración de un juicio para atender la controversia sobre el alegado discrimen por edad.

Consecuentemente, el 31 de junio de 2023, Eagle sometió una *Réplica a la Oposición de la Parte Demandante a la Solicitud de Sentencia Sumaria Presentada por Eagle.*[5] Argumentó que el despido no fue arbitrario ni caprichoso, sino que respondió al interés legítimo del patrono de mantener el buen funcionamiento del negocio. Advirtió que la apelante intentó minimizar la gravedad de su conducta alegando que era tela decomisable. Sin embargo, sostuvo que dicho dato es irrelevante, pues la conducta que motivó el despido es más bien el acto tomar algo que no le pertenece, lo que constituye una violación a la política de la empresa. En cuanto a la reclamación de discrimen por razón de edad, indicó que la apelante no fue sustituida por otras personas, pues sus funciones se distribuyeron entre otros empleados de la empresa. En vista de lo anterior, peticionó nuevamente la desestimación de la reclamación con perjuicio.

---

[4] Apéndice de Apelante, págs. 175-183.
[5] Apéndice de Apelante, págs. 184-219.

Evaluados los argumentos esbozados, el 28 de noviembre de 2023, el TPI emitió *Resolución,* notificada 29 de noviembre de 2023, declarando *Ha Lugar* a la aludida petición. Al respecto, dispuso los siguientes hechos que no están en controversia:

1. El 3 de enero de 2006 la parte querellante comenzó a trabajar como empleada de la parte querellada.

2. Desde el comienzo de su empleo la parte querellante ocupó el puesto de Operadora del área de Manufactura.

3. El salario que la parte querellante devengaba al comienzo de su empleo era $5.15 por hora.

4. A principios de 2020, la parte querellante recibió un aumento de salario.

5. El salario más alto devengado por la parte querellante en la empresa de la parte querellada fue $7.61 por hora.

6. La parte querellante era responsable por cumplir con todas las reglas de conducta, políticas y el Manual del Empleado y con el horario de trabajo asignado.

**7. La parte querellante estaba consciente de que, al firmar el contrato de empleo, ella había acordado que podía ser despedida si violaba las normas de conducta y el Manual del Empleado.**

**8. La parte querellante recibió una copia de las Reglas de Conducta de la parte querellada.**

**9. Al comenzar su empleado, la parte querellante recibió copias del Manual del Empleado en 2006.**

**10. Posteriormente, la parte querellante recibió copia del Manual del Empleado en 2015, así como el Código de Conducta y Ética de la parte querellada.**

**11. La parte querellante también recibió adiestramientos sobre el Manual del Empleado y sobre el Código de Conducta y Ética de la parte querellada.**

**12. La parte querellante admitió que, entre sus obligaciones y deberes como empleada, se le exigía el cumplimiento con las políticas, los procedimientos y con el Manual del Empleado de la compañía.**

13. La parte querellante admitió que otra de sus obligaciones y deberes como empleada, era notificar si veía que alguna persona empleada estuviera cometiendo un acto contrario a las políticas y los procedimientos de la compañía.

14. La parte querellante acusó recibo de su descripción de tareas del puesto como Operadora.

**15. Las funciones esenciales del puesto de Operadora incluían: realizar la costura necesaria para ensamblar los componentes del producto programado; inspeccionar la**

**máquina que le fuese asignada para asegurarse de identificar cualquier desperfecto o condición insegura; enhebrar la máquina de coser que le fuese asignada; operar la máquina asignada; inspeccionar las piezas producidas para identificar y reparar posibles errores; registrar la cantidad de piezas producidas; mantener altos estándares de calidad en la producción realizada y utilizar herramientas manuales en el ejercicio de su función.**

**16. La parte querellante admitió que uno de sus deberes y responsabilidades era la prohibición de hacer gestiones personales mientras estuviese en su horario laboral.**

**17. La parte querellante admitió ser consciente de que la norma 1.1 del Capítulo 1 del Manual del Empleado de la parte querellada establecía que las personas empleadas no podían entrar en su área de trabajo ni trabajar fuera de su turno sin la autorización previa de su Supervisor.**

**18. La parte querellante admitió ser consciente de que las políticas de la parte querellada en el Manual del Empleado le prohibían el uso personal del equipo de la compañía y que se dedicase a asuntos personales durante su jornada laboral.**

**19. La parte querellante no podía trabajar ni operar la maquinaria fuera de su horario de trabajo regular a menos que pidiera autorización al Supervisor.**

**20. El párrafo número 1 de las Reglas de Conducta en el Capítulo 16.1 del Manual del Empleado prohíbe el hurto o la remoción sin autorización de propiedad de la parte querellada.**

**21. La parte querellante admitió que el párrafo número 2 de las Reglas de Conducta en el Capítulo 16.1 del Manual del Empleado prohibía retirar propiedad de la compañía o de una persona empleada e incurrir en acciones deshonestas con respecto a dicha propiedad.**

**22. La parte querellante admitió que el párrafo número 29 de las Reglas de Conducta en el Capítulo 16.1 del Manual del Empleado establecía la prohibición de realizar trabajos personales en tiempo pagado por la parte querellada.**

**23. La parte querellante admitió que el párrafo número 30 de las Reglas de Conducta en el Capítulo 16.1 del Manual del Empleado establecía la prohibición de utilizar cualquier equipo y propiedad de la parte querellada para fines personales.**

**24. La parte querellante admitió que el párrafo número 34 de las Reglas de Conducta en el Capítulo 16.1 del Manual del Empleado, establecía la prohibición de permanecer en el área de trabajo después de terminar su turno de trabajo o en sus días libres.**

**25. La parte querellante admitió que la parte querellada tenía una política de seguridad mediante la cual esta se**

**reservaba el derecho de revisar las carteras, los bultos y las pertenencias de las personas empleadas a la entrada y salida de las facilidades de la parte querellada.**

**26. La parte querellante admitió que ella sabía que había cámaras de seguridad en las facilidades de la parte querellada, que había letreros que indicaban sobre las cámaras de seguridad y que dichas cámaras de seguridad se podían ver.**

**27. La parte querellante admitió que el capítulo 23 del Manual del Empleado del cual esta recibió una copia, contenía la Política de Vigilancia Electrónica impuesta por la parte querellada.**

28. La parte querellante admitió conocer sobre su deber y responsabilidad de notificar cualquier conducta que entendiera que violaba el Código de Ética o las políticas de la parte querellada.

29. La parte querellante admitió saber que existía una línea de llamadas a través de la cual podía notificarse cualquier queja de forma confidencial, sin tener que identificarse como empleada.

30. La parte querellante admitió que no utilizó esa línea de llamadas para notificar alguna información confidencial.

31. Una vez terminaba su tarea asignada o necesitara algún material particular, la parte querellante tenía que pedirle al "Runner" que le proveyera sus materiales o tenía que hablar con su supervisor para que le asignara sus tareas de trabajo.

32. La parte querellante admitió que de conformidad con las reglas de la parte querellada, no debía levantarse de su área de trabajo para buscar materiales porque había una persona empleada en el puesto de "Runner" que estaba asignada a proveerle los materiales que necesitara.

33. La parte querellante admitió que disfrutaba de media hora de descanso para tomar alimentos y que, durante ese periodo, tenía que salir de su área de trabajo para comer.

34. La parte querellante ingería sus alimentos en la cafetería de la parte querellada.

35. De enero a julio de 2020, José Marín (en adelante "Marín") era el supervisor de la parte querellante.

36. La parte querellante admitió haber tenido una muy buena relación de trabajo con Marín, y lo consideraba una persona honrada, honesta y que diría la verdad.

37. De igual modo, la parte querellante admitió haber tenido una excelente relación de trabajo con su anterior supervisor Jesús Soto y lo consideraba una persona honrada, honesta y que diría la verdad.

38. La parte querellante admitió haber tenido una buena relación de trabajo con Aleanex Arroyo (en adelante "Arroyo"), la Gerente de Operaciones de la parte querellada a

quien describió como una persona honrada, honesta y que diría la verdad.

39. La parte querellante admitió haber tenido una buena relación de trabajo con Briana Herrera a quien describió como una persona honrada, honesta y que diría la verdad.

40. La parte querellante admitió conocer que Brenda Vélez trabajaba en el área de Recursos Humanos y que esta era una persona honrada, honesta y que diría la verdad.

41. La parte querellante trabajaba en un área de manufactura que operaba como una línea de producción.

42. Para julio de 2020, la parte querellante estaba asignada al área de producción comercial, ejerciendo la función de "taqueo" o "taqueando" un producto nuevo.

43. Para julio de 2020, los compañeros de trabajo de la parte querellante, David Martínez Gerena (en adelante "Martínez") y Elizabeth también ejercían esa misma función de "taqueo".

44. Ese producto nuevo con el cual la parte querellante estaba trabajando era un "cummerbund" de un chaleco o, en otras palabras, un tipo de correa grande que llevan los militares en la cintura.

45. Según explicó la parte querellante, en el área de producción se asignaban diferentes funciones específicas a cada persona empleada a través del proceso de manufactura por lo que cada persona empleada llevaba a cabo un trabajo diferente según le fuera asignado.

46. Primero, en el área de corte, se cortaba la tela a las medidas, dimensiones y formas específicas y se pasaba al área de producción para que la cosieran.

47. En el área de producción comercial donde estaba asignada la parte querellante, ella no tenía que cortar la tela porque ya recibían la tela cortada a las medidas, dimensiones y formas específicas.

48. Luego de que la tela estaba cortada, esta se recibía en el área de producción comercial para que una persona empleada fijase las tres costuras que la parte querellante iba a taquear, entonces la parte querellante colocaba esa pieza en la máquina automática de taqueo y la pasaba hacia adelante para que continuara el proceso de manufactura hasta que se terminaba la pieza.

49. La parte querellante estaba asignada a una máquina automática de taqueo, la cual solamente se dedicaba a hacer taqueo.

50. Dicha máquina de taqueo era la única máquina que la parte querellante tenía en su área de trabajo.

51. La parte querellante no podía modificar dicha máquina que se dedicaba exclusivamente para hacer taqueo.

52. La parte querellante no recordaba si para julio de 2020, antes de trabajar con el nuevo proyecto de "cummerbund," ella trabajaba con los bultitos llamados "WPD Aero".

53. La parte querellante no recordaba si para julio de 2020, se estaba trabajando a su lado con el bulto "KB 18 x 18".

54. La parte querellante había trabajado en funciones de manufactura de muchos bultos diferentes para la parte querellada.

55. La parte querellante admitió que estuvo presente en un momento en el cual realizaban una producción y, de momento, tenían que parar dicha producción y cambiar de estilo para llevar a cabo otro proyecto diferente. Entonces, tomaban los materiales, las telas, los mangos, zippers y las cosas que iban a utilizar después y los echaban en los "boogies" para detener esa producción y, después que terminaban el nuevo proyecto, retomaban el trabajo con el proyecto anterior.

**56. El 15 de julio de 2020, la parte querellante confeccionó un bulto con un pedazo de tela de tipo camuflaje que le pertenecía a la parte querellada, cuya tela estaba cortada a las medidas y las dimensiones específicas; utilizó además otros dos pedazos de tela de la parte querellada que ya estaban debidamente cortadas para hacer los mangos del bulto, y un zipper que era propiedad de la parte querellada.**

**57. La parte querellante no tuvo que cortar la tela ni utilizar un patrón para hacer su bultito, porque dicha tela ya estaba cortada a las medidas, con sus dimensiones y forma específica, y los mangos también estaban cortados a las medidas y dimensiones correctas.**

**58. La parte querellante tomó la tela y la cosió, luego le cosió el zipper y los mangos.**

**59. La parte querellante admitió que esa tela que utilizó para hacer el bulto era propiedad de la parte querellada.**

**60. La parte querellante admitió que tenía que pedir permiso a su Supervisor para poder tomar esa tela antes de utilizarla.**

**61. La parte querellante admitió que sabía que la parte querellada requería que la persona empleada pidiera autorización y completara un documento titulado "Hoja de Registro y Control para Mover Propiedad" para poder utilizar la tela y cualquier otro producto perteneciente a la empresa de la parte querellada.**

**62. La parte querellante admitió que no pidió autorización a su supervisor y que tampoco completó el documento requerido para poder utilizar la tela y los materiales que usó para confeccionar su bultito.**

**63. La parte querellante admitió que no le pidió permiso a la gerente Arroyo, ni a su Supervisor Marín, ni a González ni a algún otro Supervisor para poder tomar esa tela que usó para confeccionar su bultito.**

**64. La parte querellante admitió que no pidió permiso para utilizar la máquina de coser de su compañera Elizabeth para coser su bultito.**

**65. La parte querellante admitió que cosió dicho bultito durante el periodo de receso de diez minutos.**

**66. La parte querellada le pagó dicho periodo de receso de diez minutos a la parte querellante.**

**67. La parte querellante admitió que el 15 de julio del 2020, luego de coser el bulto, lo dobló, enrolló y colocó dentro de una bolsa plástica negra con "tape".**

**68. La parte querellante admitió que Myrna Echegaray (en adelante "Echegaray") estuvo presente y vio el bulto que ella estaba enrollando e introduciendo en la bolsa plástica negra.**

**69. Echegaray buscó "tape" y ayudó a la parte querellante a envolver el bulto y ponerle "tape" a la bolsa negra.**

**70. La parte querellante procedió a sacar todas sus pertenencias de su cartera que era de amarillo transparente, guardó la bolsa negra que contenía dicho bulto dentro de su cartera y volvió a colocar sus demás pertenencias en su cartera.**

**71. Acto seguido, la parte querellante le enseñó su cartera amarilla transparente a Echegaray para ver si no se notaba lo que ella hizo.**

**72. Al momento de ocurrencia de los hechos antes señalados, Echegaray trabajaba como Auditora asignada al mismo proyecto especial y área donde la parte querellante ocupaba el puesto de Operadora.**

**73. La parte querellante conocía a Echegaray desde que comenzó a trabajar para la parte querellada en enero de 2006, hace aproximadamente más de 14 años.**

**74. El 15 de julio de 2020, a las 2:00 de la tarde, Arroyo recibió una confidencia del mecánico Richard Lisboa (en adelante "Lisboa") de que vio cuando la parte querellante junto a Echegaray había tomado propiedad de la parte querellada y la envolvieron y la colocaron en la cartera de la parte querellante.**

**75. Arroyo solicitó al Administrador de IT, el Sr. Restituto Dumeng, verificar las imágenes captadas por la cámara de seguridad de la empresa.**

**76. Al verificar dichas imágenes se corroboró que Echegaray le entregó a la parte querellante un rollo de cinta adhesiva y la asistió a envolver el bulto en una bolsa plástica negra.**

**77. También se observó a la parte querellante sacando los artículos que tenía en su cartera plástica amarilla transparente, colocando dicha bolsa negra al fondo de su**

cartera y volviendo a introducir en su cartera los artículos que había sacado.

78. Mientras tanto, Echegaray permanecía sentada sobre la mesa que estaba al lado de la parte querellante, quien le mostró a Echegaray su cartera para ver si no se notaba lo que ella hizo.

79. En esa tarde del 15 de julio de 2020, tanto la información obtenida mediante la confidencia de Lisboa como todos los hechos observados en la grabación de la cámara de seguridad se discutieron con la gerencia incluyendo a Darnetha Elmore (en adelante "Elmore"), Directora de Recursos Humanos. Al respecto, se decidió que las señoras Arroyo y González, Asistente de Operaciones, se reunieran con la parte querellante para investigar los hechos.

80. El 15 de julio de 2020, a las 3:00 de la tarde, Arroyo acudió al área de trabajo de la parte querellante y le pidió que recogiera sus pertenencias y la acompañara a la oficina donde ambas se reunieron con González.

81. La parte querellante admitió que en dicha reunión le aclaró a Arroyo que no se había robado nada, sino que había tomado un pedazo de tela, con dos costuras y un zipper y se había hecho un bulto.

82. En dicha reunión, la parte querellante tomó su cartera que era amarillo transparente y sacó de su interior una bolsa plástica negra con "tape", luego desenvolvió el bulto de la bolsa negra y les entregó el bulto.

83. Con posterioridad a la entrega del bulto, Arroyo le dijo a la parte querellante que esperara la llamada de Recursos Humanos. Entonces, la parte querellante le entregó a Arroyo su tarjeta de identificación y se fue.

84. Arroyo notificó a la gerencia todo lo acontecido durante la reunión que tuvo con la parte querellante y Elmore tomó la decisión de proceder con el despido de la parte querellante y Echegaray.

85. El despido de la parte querellante se hizo efectivo al próximo día 16 de julio de 2020.

86. Aunque la parte querellante primero alegó que demandó a la parte querellada porque Arroyo le dijo que era una "pilla" en dos ocasiones durante la reunión del 15 de julio de 2020, la parte querellante admitió eventualmente que Arroyo no le dijo "pilla" sino que le dijo "tú te robaste".

87. La parte querellante demandó a la parte querellada por entender que su despido fue injustificado al tratarse de la primera vez que había hurtado algo y que le parte querellada le pudo haber dado un aviso o una suspensión de empleo en vez de despedirla.

88. La parte querellante admitió que estuvo sujeta a cuatro (4) acciones disciplinarias por la parte querellada durante el periodo que ocupó el puesto de operadora.

**89. La parte querellante admitió que el 19 de marzo de 2014, Arroyo le cursó una acción disciplinaria titulada "Primer Advertencia" por violación a las normas de seguridad.**

**90. La parte querellante admitió que el 22 de septiembre de 2014, Arroyo le cursó otra acción disciplinaria titulada "Conversación con Empleado" por violación a los procedimientos de calidad tras haberle rechazado unas piezas debido a que había costuras visibles en el área del bolsillo, falta de costura en el "handel", falta de ojal, falta de taqueo en el "flap" y taqueo caído en el "outer".**

**91. En dicha acción disciplinaria del 22 de septiembre de 2014, la parte querellada le recordó a la parte querellante que era su deber auditar su trabajo para evitar que los defectos señalados pasaran de su área de trabajo a la mesa de inspección o peor aún al cliente.**

**92. Además, en dicha acción disciplinaria del 22 de septiembre de 2014, la parte querellada le recordó a la parte querellante que era responsable por cumplir con la Política de Calidad.**

**93. Dicha política se basaba en mantener el más alto estándar de calidad a través de la entrega del producto sin defectos, al cumplir o exceder las expectativas del cliente en precio y entrega, ofrecer excelencia en el servicio al cliente, implementar uniformidad y consistencia en el producto y utilizar el material más alto de calidad.**

**94. La parte querellante admitió que el 14 de julio de 2016, Arroyo le cursó otra acción disciplinaria por violación a las reglas de seguridad y a las reglas de conducta al llamarle la atención constantemente debido al nivel excesivo de conversación en su área de trabajo y las distracciones que le ocasionaba a sus compañeros de trabajo en horas laborales.**

**95. En dicha acción disciplinaria del 14 de julio de 2016, en la sección titulada consecuencias futuras, la parte querellada le advirtió a la parte querellante que si no mejoraba dramáticamente el desempeño de su trabajo, entonces continuaría con el procedimiento de disciplina progresiva que pudiera conllevar la terminación de su empleo.**

**96. La parte querellante admitió que el 20 de julio de 2018 recibió una acción disciplinaria por violación a las normas de conducta y las políticas de la compañía y que la parte querellada le indicó que le estaba dando seguimiento a su ejecutoria y conducta en el área de trabajo porque se le observaba con un nivel de conversación excesivo y por su incumplimiento con las expectativas de desempeño establecidas, ya sea productividad, eficiencia, calidad, o entrega a tiempo.**

**97. En esa acción disciplinaria del 20 de julio de 2018, al igual que en las anteriores, se le advirtió a la parte querellante sobre su deber de mejorar su productividad y calidad, y que cumpliera con las normas y las políticas**

**de la compañía para evitar que se continuara con el procedimiento de disciplina progresiva que pudiera conllevar la terminación de empleo.**

**98. La parte querellante admitió que, a raíz de esas acciones disciplinarias, ella sabía que podía ser despedida si continuaba violando las políticas de la compañía**.

**99. La parte querellante alegó que al momento de su despido tenía 44 años.**

**100. La parte querellante admitió bajo juramento que no tenía conocimiento personal de que la parte querellada hubiese contratado a una persona para sustituirla en el puesto.**

**101. La parte querellante admitió bajo juramento que no tenía conocimiento personal sobre el nombre ni la edad de la persona que, según alegó en la querella, había sido contratada para sustituirla en el puesto de operadora.**

**102. La parte querellante no regresó a las facilidades de la parte querellada con posterioridad a la fecha de despido.**

**103. Según la parte querellante, David Martínez Gerena fue quien le dijo a ella que luego de su despido la parte querellada había contratado a otra persona para ejercer sus funciones como operadora.**

**104. La parte querellante admitió que David Martínez Gerena falleció en abril de 2021.**

**105. La parte querellada no contrató a una persona empleada para que sustituyera a la parte querellante en su puesto como operadora sino que distribuyó las funciones entre las demás personas empleadas que ocupaban el mismo puesto como operadora.**

**106. A la fecha del 16 de julio de 2020, la parte querellada contaba con otras 384 personas en el mismo puesto de operadora que la parte querellante ocupaba al momento de su despido.**

**107. La edad de la parte querellante no fue un factor que la parte querellada tomó en consideración para despedirla.**

108. De las 384 personas empleadas que ocupaban el mismo puesto de operadora que ocupaba la parte querellante, el 51% (equivalente a 195 personas empleadas) tenían 40 años o más, incluyendo a 167 personas empleadas que eran mayores en edad que la parte querellante.

109. La parte querellante solicitó los beneficios por desempleo y estos se le concedieron inmediatamente tras su despido.

110. La parte querellante admitió que a partir de julio de 2020 comenzó a recibir $2,160 al mes por concepto de los beneficios por desempleo.

111. La parte querellante reconoció que le mintió a su nuevo patrono al indicarle que la causa de su despido por la parte querellada se debió a la pandemia de Covid-19. (Énfasis nuestro).

Inconforme con dicha determinación, la señora Rodríguez Soler acude ante nos a los fines de solicitar la revocación de la *Sentencia* apelada. En su escrito, plantea los siguientes señalamientos de error:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ESTABLECER COMO HECHOS INCONTROVERTIDOS EN EL CONTEXTO DE UNA SENTENCIA SUMARIA, HECHOS QUE FUERON CONTROVERTIDOS MEDIANTE LA MISMA DEPOSICIÓN QUE FORMÓ PARTE DE LOS ANEJOS DE LA MOCIÓN DE SENTENCIA SUMARIA.

ERRÓ EL HONORABLE TRIBUNAL AL ESTABLECER COMO HECHOS INCONTROVERTIDOS EN EL CONTEXTO DE UNA SENTENCIA SUMARIA, HECHOS QUE GIRAN ENTORNO A ELEMENTOS SUBJETIVOS DE INTENCIÓN.

ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR HA LUGAR UNA MOCIÓN DE SENTENCIA SUMARIA, TOMANDO COMO BASE HECHOS MATERIALES QUE SE ENCONTRABAN CONTROVERTIDOS Y HACER DETERMINACIONES SOBRE INTENCIÓN DE LAS PARTES.

El 10 de enero de 2024, esta Curia emitió *Resolución* ordenando a la parte apelada a expresarse en torno al recurso presentado. En respuesta, el 29 de enero de 2024, Eagle presentó su *Alegato en Oposición a Apelación*. Contando con la comparecencia de ambas partes, procedemos a exponer la normativa que gobierna los asuntos ante nuestra consideración.

## II.

### A. Moción de sentencia sumaria

Como es sabido, la moción de sentencia sumaria es un mecanismo procesal que permite la ágil disposición de casos sin la celebración de un juicio, siempre que no existan controversias genuinas de hechos materiales. *Birriel Colón v. Supermercado Los Colobos*, 2023 TSPR 120; *Segarra Rivera v. International Shipping Agency, Inc.*, 208 DPR 964, 979 (2022). El propósito de esta moción es que los pleitos civiles sean solucionados de forma justa, rápida y económica. *Acevedo Arocho v.*

*Departamento de Hacienda de Puerto Rico*, 2023 TSPR 80; *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 335 (2021). Procede su concesión "cuando surge claramente que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia." *Oriental Bank v. Caballero García*, 2023 TSPR 103; *Mejías v. Carrasquillo*, 185 DPR 288, 299 (2012).

La Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R.36.1, permite que una parte presente una solicitud de sentencia sumaria respaldada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Oriental Bank v. Perapi et al.*, 192 DPR 7, 25 (2014); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013). En ese sentido, "un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. Íd., pág. 213 (citando a Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, pág. 609).

A esos fines, la Regla 36.3 de Procedimiento Civil, *supra*, establece los requisitos de forma para esta clase de moción y su respectiva oposición. *Universal Insurance Company v. Estado Libre Asociado de Puerto Rico*, 211 DPR 455, 472 (2023). El precitado cuerpo reglamentario preceptúa las formalidades que debe exhibir una petición de tal naturaleza: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales debe ser dictada la

sentencia argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3(a).

En tales escenarios, la parte opositora de la sentencia sumaria "tiene que cumplir con los requisitos de la Regla 36 de Procedimiento Civil". *Oriental Bank v. Caballero García, supra*. No debe adoptar "una actitud pasiva y descansar en las aseveraciones o negaciones que consigne en su alegación". Íd. Por tanto, enumerará los hechos materiales de buena fe controvertidos y aquellos sobre los que no media controversia. Íd. También, indicará los párrafos o páginas de la prueba documental que establezcan o impugnen cada hecho. Íd. Además, identificará "los argumentos del derecho aplicable por los cuales no se debe dictar la sentencia*". Fernández Martínez v. RAD-MAN San Juan*, *supra*, pág. 336. Ahora bien, cualquier duda no es suficiente para derrotar una moción de sentencia sumaria. *Oriental Bank v. Caballero García*, *supra*; *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). **Debe tratarse de una incertidumbre que permita concluir que existe una controversia real sobre hechos relevantes y pertinentes**. (Énfasis nuestro). Íd., pág. 214.

**Para determinar si existen controversias de hechos, "el tribunal debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la moción en oposición, así como los que obren en el expediente del tribunal"**. (Énfasis nuestro). *Ramos Pérez v. Univisión*, *supra*, pág. 210. *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550 (2007). En cuanto a los documentos presentados, éstos deben analizarse de la forma más favorable para la parte promovida, concediéndole a ésta el beneficio de toda inferencia razonable que se pueda derivar de ellos. *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR 716, 734 (1994); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986).

Por otro lado, **no es recomendable emplear el mecanismo sumario en aquellos casos en los cuales median elementos subjetivos de intención, propósitos mentales o negligencia, o cuando el factor de**

**credibilidad sea esencial para dilucidar la controversia**. (Énfasis nuestro). *Segarra Rivera v. International Shipping Agency, Inc., supra,* pág. 980; *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 301 (1994). **No obstante, amerita su concesión "si el juzgador queda claramente convencido de que tiene ante sí, de forma no controvertida, todos los hechos materiales pertinentes y que una vista en los méritos es innecesaria**". (Énfasis nuestro). *Birriel Colón v. Supermercado Los Colobos*, *supra*; *SLG Fernández-Bernal v. RAD-MAN et al.*, *supra*, pág. 337.

De otra parte, **nuestro esquema procesal permite solicitar una sentencia sumaria por insuficiencia de la prueba**. (Énfasis nuestro). *Ramos Pérez v. Univisión, supra*, pág. 218; *Pérez v. El Vocero de P.R.,* 149 DPR 427, 447 (1999). Cuando el reclamante "no cuenta con evidencia suficiente para probar un elemento esencial de su caso sobre el cual tiene el peso de la prueba, procede que se dicte sentencia sumaria para desestimar la demanda". *Medina v. M.S. & D. Química P.R., Inc.*, pág. 728. En tal escenario, el promovente debe demostrar que: **(1) la vista es innecesaria; (2) el demandante no cuenta con evidencia suficiente para probar algún hecho esencial, y (3) como cuestión de derecho, procede la desestimación de la reclamación**. (Énfasis nuestro). *Ramos Pérez v. Univisión, supra*, pág. 218

En resumen, el tribunal debe abstenerse a otorgar este remedio cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho, no proceda. *Acevedo Arocho v. Departamento de Hacienda de Puerto Rico, supra; Fernández-Bernal v. RAD-MAN et al.*, *supra*, págs. 335-336.

### B. Estándar de revisión de moción de sentencia sumaria ante tribunales revisores

Los tribunales revisores se encuentran en la misma posición que el foro primario para determinar si procede una sentencia sumaria. *Birriel*

*Colón v. Supermercado Los Colobos*, *supra*. En estas instancias, ostentamos el deber de "examinar el expediente de *novo* y verificar que las partes cumplieron con las exigencias de la Regla 36.3" *Fernández Martínez v. RAD-MAN San Juan III-D, LLC, supra,* pág. 338; *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010, 1025 (2020). De resolver que los hechos materiales realmente están incontrovertidos, entonces procede "revisar si el foro primario aplicó correctamente el derecho". *Oriental Bank v. Caballero García*, *supra*. Véase, también, *Fernández Martínez v. RAD-MAN San Juan III-D, LLC, supra.* Cabe destacar que, el foro apelativo solo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González v. M. Cuebas*, *supra*, pág. 114. No tenemos facultad para adjudicar hechos materiales y esenciales en disputa, pues esa tarea corresponde al foro primario. Íd., pág. 115.

### C. Despido injustificado en Puerto Rico

Nuestro ordenamiento laboral está orientado a la protección de los trabajadores y evitar las prácticas injustas del trabajo. *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 903 (2011). A esos fines, la Ley sobre Despidos Injustificados, Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185a, según enmendada, (en adelante, Ley Núm. 80), garantiza el derecho a recibir indemnización a los empleados despedidos sin justa causa. Esta medida legislativa aplica a los empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración y (3) sean despedidos de su cargo sin que haya mediado justa causa. Íd., pág. 906. La precitada ley procura evitar las actuaciones arbitrarias del patrono e impone remedios económicos para desalentar los despidos injustificados. *Ortiz Ortiz v. Medtronic Puerto Rico Operations*, Co., 209 DPR 759, 770 (2022*); SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015). A su vez, "tiene un fin reparador al proveer a los empleados remedios consustanciales a los daños causados por despidos

injustificados". *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 596 (2013); *Beauchamp v. Holsum Bakers of P.R.*, 116 DPR 522, 526 (1985).

Ahora bien, no existe una prohibición absoluta contra el despido de un empleado. *Rivera Figueroa v. The Fuller Brush Co*, *supra*, pág. 904. Aunque la referida ley no define con precisión lo que constituye un despido injustificado, enumera una serie de supuestos que justifican el despido de un empleado. Específicamente, el Artículo 2 de la Ley Núm. 80, *supra*, fija una serie instancias que justifican el despido de un empleado:

> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
>
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
>
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.
>
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento según los cuales se justifica el despido de un empleado. 29 LPRA sec. 185b.

Es menester destacar que, la Ley Núm. 80, *supra*, no es un código de conducta, ni establece una lista de faltas definidas o taxativas ya que no pretende, ni puede, considerar la variedad de circunstancias y normas de los múltiples establecimientos de trabajo. *González Santiago v. Baxter Healthcare of Puerto Rico*, 202 DPR 281, 292 (2019); *SLG Torres-*

*Matundan v. Centro Patología*, 193 DPR 920, 930 (2015). El examen jurídico requiere considerar que el despido no está motivado por razones **legalmente prohibidas y no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono**. (Énfasis nuestro). 29 LPRA sec. 185b. Véase, además, *González Santiago v. Baxter Healthcare of Puerto Rico, supra*., pág. 302.

Aunque no se avala el despido ante una primera sanción, "el citado estatuto no excluye de la sanción o despido en primera o única ofensa aquella falta cuya intensidad de agravio así lo requiera en protección de la buena marcha de la empresa y la seguridad de las personas que allí laboran". *Feliciano Martes v. Sheraton*, 182 DPR 368, 383 (2011); *Rivera v. Pan Pepín,* 61 DPR 681, 690 (2004). De hecho, **el referido estatuto "no dispone un mínimo de amonestaciones antes de que el patrono pueda despedir al empleado justificadamente, ni tampoco que la amonestación debe hacerse en determinada forma**". (Énfasis nuestro). *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, *supra*, pág. 773 (citando a A. Acevedo Colom, *Legislación protectora del trabajo comentada*, 8va ed. rev., San Juan, Ed. Ramallo Printing Bros., 2005, págs. 137-138).

En estos escenarios, le corresponde al patrono derrotar la presunción de que "todo despido es injustificado". *Rivera Figueroa v. The Fuller Brush Co, supra,* pág. 906. **Debe demostrar mediante preponderancia de la prueba, que medió justa causa para decretar el despido**. (Énfasis suplido). *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, *supra*, pág. 774; *Rivera Figueroa v. The Fuller Brush Co., supra*, págs. 906–907. En particular, la ley le impone "la carga probatoria de justificar en la afirmativa su actuación, exponiendo en la contestación a una querella los hechos que dieron origen al despido" *Feliciano Martes v. Sheraton*, 182 DPR 368, 385 (2011); *Báez García v. Cooper labs., Inc.,* 120 DPR 145, 151-153 (1987). Por su parte, "[el] demandante tiene la obligación de aportar prueba que establezca los hechos básicos que den lugar a la

presunción". *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, *supra*, pág. 775; *Rivera Figueroa v. The Fuller Brush Co.*, *supra*, pág. 911.

### D. Despido por razón de discrimen de edad

La Constitución de Puerto Rico prohíbe el "discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1. En virtud de ese mandato, la Asamblea Legislativa extendió la garantía constitucional "al ámbito privado y, en lo aquí pertinente, al contexto laboral". *Lebrón Laureano v. Departamento de Corrección y Rehabilitación*, 209 DPR 539, 548 (2022). En esa dirección, la Ley Contra el Discrimen en el Empleo, Ley Núm. 100 de 30 de Junio de 1959, según enmendada, 29 LPRA sec. 146 (en adelante, Ley Núm. 100), "incorpora el lenguaje constitucional y establece responsabilidad civil y criminal a los patronos privados que discriminen en el reclutamiento o en el empleo, al crear una causa de acción de daños y perjuicios para el empleado discriminado". *Garib Bazain v. Hospital Español Auxilio Mutuo de Puerto Rico*, 204 DPR 601, 615 (2020). Véase, también, *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 381 (2001).

El Artículo 3 de la Ley Núm. 100, *supra*, dispone "una presunción de discrimen ilegal cuando el despido haya sido efectuado sin justa causa". *Ramos Pérez v. Univisión*, *supra*, pág. 222. Sin embargo, dicha presunción no opera de manera automática. De acuerdo con el Tribunal Supremo de Puerto Rico, la reclamación debe exhibir los siguientes elementos probatorios:

> Para activar la presunción de discrimen, el empleado demandante tiene que probar tres elementos: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; (3) presentar evidencia indicativa de la modalidad de discrimen que se vincula al despido. *Díaz v. Wyndham Hotel Corp*, *supra*, pág. 384.

Exhibidos los criterios aludidos, el patrono puede vencer la presunción activada mediante tres alternativas: (1) derrotar el hecho básico en cuanto a la ausencia de justa causa; (2) destruir el hecho presumido en torno a que el despido fue por causa de motivos discriminatorios; o (3)

destruir el hecho básico y presumido a la vez. *Segarra Rivera v. International Shipping Agency, Inc.*, *supra*, pág. 990.

En las reclamaciones de discrimen por edad, la normativa imperante exige que el demandante demuestre unos elementos adicionales. A modo ilustrativo, nuestro alto foro discute que el demandante puede presentar prueba a los fines de establecer los siguientes hechos:

> [Q]ue (1) pertenece a la clase protegida por el estatuto, a saber, su edad; o (2) que estaba cualificado para ejercer el puesto que ocupaba; o (3) que fue despedido, o (4) que fue sustituido por una persona más joven, esto es, algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama. *Segarra Rivera v. International Shipping Agency, Inc.*, *supra*, págs. 989-990; *Díaz v. Wyndham Hotel Corp.*, *supra*, págs. 389-390

Ahora bien, **"cuando un patrono despide a un empleado mediando justa causa, no puede ser responsable de discrimen al amparo de la Ley Núm. 100, supra**". (Énfasis nuestro). *Segarra Rivera v. International Shipping Agency, Inc.*, supra, pág. 989.

**III.**

En el presente caso, la señora Rodríguez Soler señala que incidió el foro primario al desestimar sumariamente su reclamación por despido injustificado. En particular, contiende que existen hechos materiales en controversia respecto a los elementos subjetivos de intención. Aduce, también, que el patrono incurrió en discrimen por razón de edad tras decretar la terminación de su empleo. Por tanto, arguye que no mediaron las circunstancias que justificaran su despido.

Amparados en nuestras facultades revisoras, nos encontramos en misma posición que el tribunal recurrido para dictar sentencia sumaria. En virtud de dicha norma, evaluamos la *Moción de Sentencia Sumaria*, la *Oposición* y la *Réplica*, con sus respectivas declaraciones juradas y documentación evidenciaria. Sin embargo, no identificamos una controversia de hechos materiales ni una aplicación errónea del derecho, que impidiesen al tribunal dictar sentencia sumaria. Veamos.

En primer lugar, destacamos que Eagle cumplió a cabalidad con los requisitos de forma dispuesto la Regla 36 (a) de Procedimiento Civil para

solicitar la desestimación del reclamo mediante la vía sumaria. Entre las formalidades más importantes, desglosó mediante párrafos enumerados ciento nueve (109) hechos no controvertidos apoyados en la correspondiente evidencia admisible.[6] En respuesta, la apelante presentó su *Oposición a la Sentencia Sumaria*.[7] No obstante, limitó su alegación a exponer que Eagle autorizaba la confección de piezas para uso personal con material decomisable de la compañía. A su vez, insistió que no procedía dictar sentencia sumaria, pues existen hechos en controversia en torno a los elementos subjetivos de intención. Al respecto, presentó el siguiente razonamiento:

> 65. Luego de meter sus cosas en su cartera, la Demandante procedió a enseñarle su cartera, la cual era amarilla transparente, a Echegaray para ver si no se notaba lo que ella hizo. Exhibit 1 - Deposición, p. 56, L. 2-16; p. 57, L. 2-9; p. 135, L. 4-7; p. 136, L. 9-13 p. 137, L. 5-10; p. 139, L. 2-25; p. 140, L. 1- 4y L. 18-23; 141, L. 3-8)"
>
> **Este hecho se encuentra en controversia. La base que utiliza la parte demandante para sostener este hecho como uno incontrovertido en su propia deposición, gira en torno a elementos subjetivos de intención. De la propia deposición de la parte demandante, no se desprende bajo juramento, que la acción que realiza la parte demandante fuera "para ver si no se notaba lo que ella hizo**". (Énfasis nuestro).[8]

A pesar de que la apelante negó una serie de alegaciones fácticas, no controvirtió los hechos esenciales dictaminados en su contra. Tampoco demostró que contaba con los elementos probatorios pertinentes para respaldar su causa de acción. **Cónsono con lo anterior, puntualizamos que nuestro ordenamiento jurídico permite desestimar una reclamación mediante sentencia sumaria por insuficiencia de prueba**. (Énfasis nuestro). *Ramos Pérez v. Univisión*, *supra*, pág. 218; *Pérez v. Vocero de P.R.*, supra, pág. 447. A la luz de dicha normativa, determinamos que actuó correctamente el foro primario al desestimar la reclamación mediante sentencia sumaria, toda vez que la apelante no cuenta con

---

[6] Apéndice de Apelante, págs. 14-22
[7] Apéndice de Apelante, págs. 175-183.
[8] Apéndice de Apelante, pág. 178.

evidencia sustancial para probar los hechos esenciales en torno a su reclamación.

En los méritos del caso, nos corresponde aplicar la normativa jurídica vinculante a la controversia. El Artículo 2 de la Ley Núm. 80, *supra*, establece varias instancias para justificar el despido de un empleado. Entre otros extremos, la disposición precitada fija las siguientes circunstancias que motivan la terminación del empleo: (1) que el empleado incurra en un patrón de conducta impropia o desordenada; (2) que incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente, lo que incluye el incumplimiento con normas y estándares de calidad y seguridad del patrono; o (3) que incurra en una violación reiterada de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que haya copia escritas de los mismos suministrada oportunamente al empleado. 29 LPRA sec. 185b. A su vez, el referido estatuto contempla como despido justificado aquel que no está motivado por razones legalmente prohibidas y no sea producto del mero capricho del patrono. 29 LPRA sec. 185b.

Evaluado el expediente ante nuestra consideración, determinamos que en el caso presente mediaron las circunstancias que justificaban el despido de la señora Rodríguez Soler. **La apelante incurrió en conducta impropia que, a su vez, constituyó una violación reiterada de la política reglamentaria de la empresa apelada**. (Énfasis nuestro). Al respecto, conviene presentar la cadena de incidencias que concluyeron en su despido. Veamos.

El 19 de marzo de 2014, el patrono remitió a la empleada apelante un escrito intitulado *Notificación de Advertencia en el Empleo*.[9] En lo concerniente a dicha acción disciplinaria, emitió la siguiente advertencia:

> Como operaria de esta área es su responsabilidad el asegurar el cumplimiento con las regulaciones, políticas y procedimiento de seguridad, y tomar acción inmediata. El operario es responsable de asegurarse que las guardas estén en las máquinas y de no tenerlas no se operará la máquina. Esto es una violación a nuestra política de Cultura de

---

[9] Apéndice de Apelante, pág. 169.

Seguridad (Manual del Empleo, Capítulo 7), a nuestro valor de Seguridad y a la siguiente regla de conducta (Manual del Empleado, Capítulo 17):

Incumplir con las reglas y procedimiento de seguridad, incluyendo el incumplir en la utilización adecuado de los equipos de seguridad.[10]

A su vez, le indicó que de continuar con dicha conducta proseguiría un proceso disciplinario que podría conllevar la separación de su empleo.

Eventualmente, el 22 de septiembre de 2014, Eagle cursó a la apelante una comunicación intitulada *Conversación con Empleado*.[11] En este documento especificó que sus confecciones no exhibieron los estándares de calidad acostumbrados por la empresa:

1. Costura visible en el área del bolsillo.
2. Falta de cordura en el handel.
3. Falta de ojal.
4. Falta de taqueo en el Flap.
5. Taqueo caído en el outer.[12]

A su vez, le notificó que de continuar con ese patrón de conducta o de no cumplir con el desempeño esperado, la compañía adoptaría un procedimiento de disciplina progresivo, que pudiera concluir en la terminación del empleo.

El 14 de julio de 2016, el patrono le envió a la empleada apelante una *Notificación de Advertencia en Empleo*.[13] En este documento, detalló la siguiente incidencia:

Constantemente se le ha estado llamando la atención tanto su Supervisor como el Gerente de producción, sobre el nivel de conversación excesiva en el área de trabajo y distracciones a sus compañeros. Usted continúa hablando y distrayendo el personal a su alrededor y de otras áreas con frecuencia.

Esto constituye una violación a la siguiente política de Seguridad (Capítulo 7; Inciso 9 Seguridad y Buen Orden)

Usted deberá observar las medidas de seguridad y buen orden en todo momento. La falta de limpieza u orden afecta tanto su disposición hacia el trabajo como la de sus compañeros. Las distracciones innecesarias en el desempeño de nuestros deberes resultan en ineficiencias y crean riesgos de peligro. Debemos dar toda nuestra atención al trabajo. Por consiguiente, no se les permitirá a nuestros empleados involucrarse en conversaciones excesivas en sus

---

[10] Apéndice de Apelante, pág. 169.
[11] Apéndice de Apelante, págs. 170-172.
[12] Apéndice de Apelante, pág. 170.
[13] Apéndice de Apelante, pág. 173.

> puestos de trabajo o llevar a cabo actividades no relacionadas con su trabajo.
>
> También es una violación al Código de Conducta y Reglas en el Empleo (Capítulo 16.1 Reglas de Conducta)
>
> Holgazanear, conversaciones excesivas, perder el tiempo o dormir en el trabajo.[14]

Nuevamente la compañía apelada le avisó sobre la posibilidad de surgir un procedimiento disciplinario, el cual pudiese concluir en la separación de su empleo.

Posteriormente, el 20 de junio de 2018, Eagle remitió a la apelante un escrito intitulado *Conversación con Empleado.*[15] En este documento expuso la siguiente observación:

> Dándole seguimiento a su ejecutoria y a su conducta en el área de trabajo. A usted se le observa en un nivel de conversación excesivo. Es de su conocimiento que el nivel de conversación en el área de trabajo es documentada. No cumplir con las expectativas de desempeño establecido, ya sea productividad, eficiencia, calidad, entregas a tiempo, entre otras son violaciones a la compañía.[16]

De igual modo, reiteró que, de continuar con el incumplimiento de las normas empresariales, la compañía proseguiría un proceso de disciplinario, que pudiese conllevar la terminación del empleo.

Finalmente, el 15 de julio de 2020, ocurrió el suceso que motivó la destitución de la apelante. Surge de la prueba que obra en el expediente que, ese día ésta tomó sin autorización material perteneciente a Eagle a los fines de confeccionar una pieza de uso personal.[17] Luego procedió a envolverla en una bolsa y a guardarla en su cartera.[18] De la transcripción de la deposición admitida en evidencia se desprende la conducta específica que conllevó su despido:

> P. Okey. Escuche mi pregunta. ¿Usted se acuerda del 15 de julio del 2020 a qué hora fue que usted guardó el bulto en su cartera? ¿Fue por la tarde?
>
> R. La realidad no… no recuerdo la hora.
>
> **P. No recuerda la hora, okey. ¿Usted recuerda cómo fue que usted guardó ese bulto en su cartera?**

---

[14] Apéndice de Apelante, pág. 173.
[15] Apéndice de Apelante, pág. 174.
[16] Apéndice de Apelante, pág. 174.
[17] Apéndice de Apelante, págs. 50-55.
[18] Apéndice de apelante, pág. 53.

**Lo guardé… lo doblé y lo puse dentro de la cartera.**

**P. Dentro de una bolsa negra plástica, ¿verdad que sí?**

**R. Sí.**

**P. Exacto. Usted cogió ese bulto negro, y usted lo dobló, lo enrolló bien enrolla'ito, lo metió dentro de una bolsa negra plástica; y esa bolsa negra plástica, usted la enrolló y la metió dentro de su cartera, ¿correcto?**

**R. Sí.**

**P. Exacto. Y en ese proceso, Myrna Echegaray la ayudó a usted. De hecho, ella fue y buscó "tape" y la ayudó a usted a ponerle "tape", ¿verdad que sí?**

**R. Sí, fue así.**

**P. Okey. Muy bien. Y Myrna Echegaray vio el bulto que usted estaba enrollando, ¿verdad que sí?**

**R. Lo vio.**

**P. Claro. Y la vio a usted cuando usted lo metió dentro de la bolsa negra y lo envolvió, y la ayudó a ponerle "tape" pa' que se envolviera bien, ¿verdad que sí?**

**R. ¿Para qué? ¿Perdóneme?**

**P. Para que se envolviera bien el bulto y no se abriera.**

**R. Sí, ella estaba… estaba conmigo, pero no…**

**P. De hecho, ella fue y buscó el "tape", ¿verdad que sí?**

**R. Ahí no recuerdo.**

**P. No recuerda. Y la ayudó a usted a envolver el bulto, ¿verdad que sí?**

**R. Sí**. (Énfasis nuestro).[19]

Tal actuación constituyó una seria violación a la política empresarial. Conviene señalar que, el Capítulo 16 del Manual del Empleado establece las posibles consecuencias en casos de incumplimiento con la normativa empresarial:

**La conducta inapropiada, desempeño deficiente, negligencia al realizar sus funciones violaciones a las políticas de la Compañía y desatender los intereses de Eagle Industries podrá resultar en acciones disciplinarias, incluyendo en la terminación del empleo.**

Para proteger los derechos de cada individuo y asegurar una operación segura, ordenada y eficiente dentro de la

---

[19] Apéndice de Apelante, págs. 53-54.

Compañía, se han establecido las siguientes reglas de conducta. Estas reglas no se diseñaron para restringir los derechos de los empleados sino para ayudar a la Compañía a manejar los problemas disciplinarios de manera consistente y justa. **El incumplimiento de cualquiera de las reglas que se formulan a continuación podrá ser motivo para que la Compañía tome la acción disciplinaria que estime apropiada según sea la gravedad de la ofensa y demás circunstancias, las que pueden incluir hasta la terminación del empleo**.

**Es imposible y no es práctico publicar todas las políticas y procedimientos que requieran acción disciplinaria. La Compañía se reserva el derecho de tomar aquellas acciones disciplinarias que entienda necesarias por otros actos o conductas que no están expresados en las siguientes reglas cuando tales acciones o conductas atenten contra el buen y normal funcionamiento de la Compañía.**

**En los casos en que existan motivos para creer que existe un peligro de destrucción o hurto de propiedad de la Compañía, o riesgo a la seguridad de sus empleados, visitantes o contratistas, se tomarán medidas disciplinarias de acuerdo a la situación, incluyendo la suspensión del empleo mientras se realiza la investigación. Esta suspensión preventiva puede ser previa a la determinación de despido**. (Énfasis nuestro).

Cónsono con lo anterior, el Capítulo 16.1 del Manual prohíbe terminantemente tomar sin autorización propiedad de Eagle:

Las siguientes violaciones son algunos ejemplos de conducta prohibida por la Compañía. Incurrir en algunas de las siguientes violaciones conllevará acciones disciplinarias, que podrán incluir hasta el despido:

**1. Hurto o remoción sin autorización de propiedad de Eagle Industries del Caribe.**

**2. Retiro de propiedad de la Compañía o de un empleado, o acciones deshonestas con respecto a dicha propiedad.** (Énfasis nuestro).

Ciertamente, la apelante violentó las referidas normas de conducta empresarial. Por cierto, Eagle cuenta con una *Hoja de Registro y Control para Mover Propiedad*.[20] Sin embargo, no sometió dicha documentación ante su patrono. Así consta en la declaración recogida en la transcripción de la deposición:

**P. Okey. Mire, y usted sabe que en Eagle, para usted poder utilizar tela y utilizar cualquier producto de Eagle, usted tenía que pedir autorización y llenar un papelito, ¿verdad que sí?**

---

[20] Apéndice de Apelante, pág. 155.

**R. Sí, pero la realidad es--**

**P. Mire, mire, que si usted sabía que esa es la regla, la norma.**

**R. Sí, esa es la regla.**

**P. De hecho, le voy a mostrar un documento y le voy a pedir que me diga si lo ha visto antes. Esta es la hojita que se supone que usted llenara si usted quería utilizar esa tela, ¿verdad que sí?**

**R. Sí.**

**P. Y lo cierto es, que usted no llenó ese papelito pa' esa tela que usted dice que usted 20 cogió, ¿verdad que no?**

**R. No, no… no la llené**. (Énfasis nuestro).[21]

Destacamos que la apelante tenía conocimiento de las precitadas normas y políticas de su centro de trabajo. De hecho, constan sus firmas correspondientes a los años 2006, 2014 y 2015, que así lo certifican.[22] Además, participó de un proceso de adiestramiento en el cual recibió una *Certificación de Capacitación 2014 en Código de Conducta Ética Empresarial de ATK.*[23] A su vez, en el 2015 recibió un *Certificado de Adiestramiento* por asistir a una orientación sobre la revisión del Manual de Empleado.[24] Por tanto, no estaba ajena a la política de Eagle y a las posibles consecuencias que pudiese enfrentar por el incumplimiento de las reglas empresariales.

Expuesto lo anterior, resulta forzoso concluir que el patrono apelado demostró con evidencia suficiente que mediaron las circunstancias justificadas para la destitución de la empleada a tenor con la Ley Núm. 80, *supra*. Luego de una serie de oportunidades y advertencias brindadas por la compañía, la apelante incurrió nuevamente en una violación al Manual de Empleado. En específico, tomó sin autorización propiedad perteneciente a Eagle para la confección de un artículo personal. En vista de lo anterior, la compañía determinó que procedía decretar su despido en aras de salvaguardar el buen funcionamiento de la empresa. Por tanto. resolvemos

---

[21] Apéndice de Apelante, pág. 118.
[22] Apéndice de Apelante, págs. 120-122.
[23] Apéndice de Apelante, pág. 123.
[24] Apéndice de Apelante, pág. 124.

que la compañía apelada rebatió satisfactoriamente la presunción de despido injustificado que amparaba a la apelante.  Determinamos que la terminación del empleo no ocurrió por razones legalmente prohibidas o por mero capricho del patrono. No obra del expediente prueba para controvertir tal determinación.

Por último, la apelante esbozó un planteamiento adicional por presunto discrimen de edad en el empleo al amparo de la Ley Núm. 100, *supra.* Resulta innecesario discutir este señalamiento tras determinar que mediaron las circunstancias justificadas para decretar su despido. Además, no surge del expediente material probatorio que nos motive a atender tal alegación.

**IV.**

Por los fundamentos antes expuestos, *confirmamos* la Sentencia del Tribunal de Primera Instancia mediante la cual se desestimó la querella presentada por la señora Rodríguez Soler.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones